In re June Ann **ELSER** and Robert
Alan Elser, Debtors.

June Ann Elser and Robert
Alan Elser, Movants,

v.

West View Savings Bank, Respondent.

No. 99–26115.

United States Bankruptcy Court,
W.D. Pennsylvania.

June 12, 2000.

Owen W. Katz, Pittsburgh, PA, for
Debtor.

Lewis E. Linn, III, Pittsburgh, PA, for
West View Savings Bank.

**MEMORANDUM OPINION**[1]

JUDITH K. FITZGERALD, Chief
Judge.

Before the court is the Debtors' Motion
to Determine Secured Status of the third
mortgage against its property held by
West View Savings Bank. The parties
agree that there is a first mortgage held
by PNC and a second mortgage held by
First Union Mortgage Company. In addi-
tion, the parties agree that there are sev-
eral tax liens against the property. The
tax liens and first and second mortgages
prime the third mortgage. The parties
have stipulated for purposes of this hear-
ing that the total value of the liens against
the property with priority over West
View's is $112,215.15.

Debtors contend that their property is
worth $105,000.00 and produced an expert
appraiser, Shannon Ingersoll, who so testi-
fied. West View Savings Bank produced
an appraiser, William Yoder, who testified
that the value of the property is between
$150,000.00 and $155,000.00. The experts
agree that the condition of this property is
not up to par. In addition to the apprais-
ers' reports and testimony, the court also
heard testimony from Debtor June Elser.
Ms. Elser explained that there are some
repairs needed to portions of the property.
For example, most of the wallpaper is old
and some trim has been missing from the
walls in different rooms of the house since
it was built. The parties were in the
process of making modifications to the in-
terior when, according to Ms. Elser, they
ran out of money. As a result, there are
partially built walls in the foyer, a cabinet
that was removed and not replaced in the
main floor powder room, and some paint-
ing and similar work that must be complet-
ed to put the house in A–1 condition. The
parties agree that the Debtors made some
repairs and modernized the property to a

---

1. This Memorandum Opinion constitutes the
   court's findings of fact and conclusions of law.

certain degree. For example, the bedrooms occupied by the parties' two sons are in relatively good condition, although one has holes in the walls that are covered with pictures and the carpeting in one is the original. Ms. Elser testified that Debtors installed a new bathroom in the basement. The house is "all electric" and there is no gas service. Everything in the house is original since Debtors moved in in January 1985 with few exceptions. One exception is a relatively new dishwasher.

There are, however, some major issues that the Debtors must address in order to put their property into prime marketable condition. For example, there was evidence that sewage backs up through a drain in the floor and fills up a portion of the parties' basement. Ms. Elser explained that when there is no electricity to the pump (and this occurs when there is a short circuit due to dampness), the sewage is not pushed away from the house. This phenomenon is explained by Ms. Elser as the result of the method by which the leach bed was installed: the leach bed is behind and above the house, toward the backyard. The sewage must be pumped upward at a 45 degree angle. When the pump fails the sewage simply comes up into the house as it is not pumped to the leach bed. The sewage has flooded into the basement on several occasions, leaving behind dampness which has not been corrected, mold on the walls, damp insulation, damaged flooring and interior trim, an inoperable water softener tank due to corrosion from the sewage, and assorted other damages. Debtors had purchased the water softener to stop discoloration from their well water. Debtors are serviced with well water and a septic system, not from public utility service.

An even more significant problem with marketability of this house is that it has no operable central heating or air conditioning system. The house, which is located at 302 Ridgeway Drive in Baden, Economy Borough, Beaver County, Pennsylvania, is heated by use of a wood burning fireplace in the living room and a cast iron stove that uses propane gas. Debtors obtained estimates to replace the inoperable furnace that ranged from $3,500.00 to about $5,500.00. They cannot afford the replacement. In addition, there was a central air conditioning system which is also now inoperable. The main unit sits outside. It has rusted and has leaks in so many places that it will not hold the freon needed for cooling.

The house is in disrepair in other respects. Ms. Elser testified that there is a lot of moisture inasmuch as there are two springs, one on either side of her home. This contributed to the decay of the rear wooden deck. She also testified that only half of the stove works and that the kitchen countertops move. Debtors installed vinyl peel and stick tiles on the kitchen floor but they are pulling apart because the work was never finished. Pantry doors are missing because they were metal that rusted and they are warped. In the family room there is a hole in the carpet from coal falling out of the fireplace and burning the rug. The carpet is also stained and matted. The commode in the powder room leaks. In the living room the walls do not fit together properly. The floor around the fireplace is warped. The interior brick is pulling away from the wall. Caulking and grout are missing around the bathtub in the children's bathroom on the second floor. Fixtures are stained. The commode does not function properly and must be plunged with each use. Carpets throughout are worn. In the foyer by the front door the floor is pulling away. The coat closet has no doors because they were corroded metal that Debtors removed.

The appraisers testified that the property is in "fair" or "below average" condition. The court credits Ms. Ingersoll's testimony that not many houses on the market show the degree of deferred maintenance that this one does and that the typical buyer would pass up a house in this condition if

another comparably sized house that did not need so much work was available.

This house, which was described by Debtors' expert as a pre-fabricated home, and by creditors' expert as pre-cut, was purchased by Debtors and installed on the lot. Debtors moved into the house in January, 1985. The house has settled, and the settling has led to additional damage to the property. The evidence showed that the stairs leading up to the house from the street are not properly attached and are loose. Neighbors refuse to use them. Debtors built an exterior deck. However, they did not use wolmanized lumber and, as a result, since its installation in 1987, the deck has decayed and is unsafe for a person to stand on. Debtors have not torn it down because they use it as a place for their dog to exercise outdoors.

The experts varied significantly in the types of comparable homes used to assess value. Based on the comparability of the homes chosen, the court finds that the homes selected by Ms. Ingersoll are more comparable than those selected by Mr. Yoder. Ms. Ingersoll testified that the condition of Debtors' house in terms of marketability is below average. She referred to the "principle of substitution" and used a definition stated in the HUD Handbook "Valuation Analysis for Home Mortgage Insurance". *See* Trial Exhibit 45C. The Appraisal Terminology section of the HUD Handbook describes the principle of substitution as follows:

A valuation principle that states that a prudent purchaser would pay no more for real property than the cost of acquiring an equally desirable substitute on the open market. The Principle of Substitution presumes that the purchaser will consider the alternatives available to him, that he will act rationally, or prudently on the basis of his information about those alternatives, and that time is not a significant factor. Substitution may assume the form of the purchase of an existing property, with the same utility, or of acquiring an investment which will produce an income stream of the same size with the same risk as that involved in the property in question.

Trial Exhibit 45C. Debtor's expert, William Yoder, used a definition of the principle of substitution from the National Association of Independent Fee Appraisers which provides:

When two or more commodities of similar utility are available, the one with the lowest price will receive the greatest demand. The principle of substitution is applicable to the valuation of real estate, since no person is justified in paying more for property than the cost of buying land and reconstructing a similar building without undue delay.

Trial Exhibit 45C. We find that the principle of substitution advocated by Ms. Ingersoll more accurately reflects what a typical prudent buyer would do in the circumstances of this case, and that the lowest price would not be the controlling factor when a buyer would have to incur the expense and inconvenience of the numerous repairs identified by these parties.

Ms. Ingersoll testified concerning the comparable properties she chose in formulating her appraisal. The Debtors' house is prefabricated and prefabricated houses usually are of lesser quality than custom built houses. She tried to choose similar construction which would have similar appeal to a buyer. That is, she chose properties that had two stories and two and one-half baths. She identified properties with similar design, appeal and quality by using descriptions in the multi-list and then personally visually inspecting them. The comparables that she chose were similar in use, size, style, location, and room count. The condition of the comparables, however, were superior to Debtors' and had new or newer roofs, operable furnaces, and central air conditioning. Some of the comparables had newer carpeting, kitchens, and windows. With respect to Debtors' property, she adjusted for the extra bath, the lack of central heating and the absence of air conditioning, the cost to fix

or replace the inoperable furnace and the inconvenience of making the necessary repairs. Her opinion was that a typical buyer would not have purchased the Debtors' house for what they would have paid for the comparables. The comparables were valued between $102,700 and $109,200 and all were stated to be in superior condition to Debtors'.

As further description of the market area and examples of available properties, Ms. Ingersoll also provided photographs and multi-list descriptions of houses that were on the market at the time of trial. Property at 138 Oakhaven Drive had been listed at $120,000 but reduced to $118,000 and was described as closely resembling Debtors' house but with updates, gas heat, central air and public water and sewer. The property at 395 Freedom Street, listed at $129,900, had oil heat, central cooling, and public water and sewer and is described in the multi-list as "well-kept". The property at 111 Walnut Drive, listed at $134,900, has been updated with gas heat, central air and public water and sewer. Debtors' property uses a well and septic system. Exhibit 45B is a Supplemental Addendum to Ms. Ingersoll's report. It states that in the year 2000 the municipality (Economy Borough in Beaver County) will require all houses using wells and septic systems to tap into the public water supply and sewer system. The estimated cost for water tap-in is $3,500 and for sewer tap-in is $6,500. Ms. Ingersoll's supplemental report states that these costs will have to be considered in marketing the house if it is to be sold.

William Yoder testified for West View Savings Bank. He identified the house as "pre-cut" and not pre-fabricated because the walls were completed on site. He testified that the difference between his appraisal and Ms. Ingersoll's is based on the different socio-economic makeup in the residential subdivisions each used. He testified that Ms. Ingersoll used an incorrect lot value which lowered the value of the property. Of the comparables Mr.

Yoder used, the property at 1 Krepps Road, which sold for $161,250 in January of 1999, is not in Debtors' plan but is located seven miles away. Mr. Yoder also used a house located at 204 Fernwood Drive in Bradford Park which is an area with more expensive houses. It sold in November of 1998 for $175,000. The third comparable used by Mr. Yoder is located at 134 Mary Reed Road. It sold in November of 1998 for $159,900.

Ms. Ingersoll testified that she also considered the Fernwood Drive property but rejected it as a comparable because it was larger than Debtors' house, custom built, had better curb appeal, and was the subject of a sale in 1998 which she felt was too long ago. She also testified that if Debtors' house were in the Bradford Park area it was not likely that a buyer would pay more for it just because of the location. With respect to the Mary Reed Road property Ms. Ingersoll testified that she had not used it because it was only five years old, had over 300 more square feet than Debtors' house, was in a new plan and had superior appeal.

Mr. Yoder testified that there are different strata of properties. Those selling for less than $120,000 are small split entries and those selling for more than $150,000 have eight rooms, 2½ baths and two stories. He agreed that if the court finds that Debtors' house fits more with the smaller houses Ms. Ingersoll's comparables should be used. He also testified regarding physical depreciation and the effective age of Debtors' property and concluded that the "cost of cure" would be between $5,000 and $7,000. This estimate is not realistic in light of the fact that a new furnace alone would cost between $3,500 and $5,500.

The court finds Ms. Ingersoll's appraisal more realistic than Mr. Yoder's. The comparables she used more closely resemble Debtors' house with respect to size and type of neighborhood. Further, her explanation of typical buyer behavior, in light of the condition of Debtors' house, is persua-

sive. The court concludes that the value of Debtors' house is at the lower end of the price scale. Inasmuch as we accept Ms. Ingersoll's appraisal, we find that Debtors' property is worth at most $105,000. Inasmuch as the parties stipulated that the total amount of the liens with priority over West View Savings Bank's is $112,215.15, West View's mortgage is wholly unsecured.